**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**JOHN C. WILDS,**

      **Plaintiff,**

**vs.**                        **Case No. 1:10cv131-MP/WCS**

**MICHAEL J. ASTRUE,
SOCIAL SECURITY ADMINISTRATION,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, John C. Wilds, "protectively filed applications for a period of disability, disability insurance benefits" (under Title II of the Social Security Act) and Supplemental Security Income [SSI] benefits (under Title XVI of the Act) on March 7, 2006, alleging disability beginning January 30, 2006. Doc. 1, p. 2; R. 11 (doc. 9-2, p. 12);[1] *see also*

_____

[1] From hereafter, only the page number as listed on the bottom right corner of the record will be referenced.

doc. 15, p. 1. Plaintiff's "applications were denied initially on August 21, 2006,[2] and upon reconsideration on February 7, 2007." Doc. 1, p. 2; R. 11. Plaintiff timely requested review, and the hearing was held on October 20, 2008, with Plaintiff represented by a non-attorney representative. Doc. 1, p. 2; R. 11. The Administrative Law Judge rendered an unfavorable decision on January 20, 2009, finding Plaintiff was not entitled to a period of disability and disability insurance benefits or supplemental security income. Doc. 1, p. 2; R. 11-21.

Plaintiff, who was born in 1974, was 31 years old at the time of the administrative opinion denying his claim, has at least a high school education, and has past relevant work as an automobile mechanic. R. 19. Plaintiff alleges disability beginning on January 30, 2006, due to multiple injuries from a bicycle accident. Doc. 15, p. 2; R. 185.

The ALJ concluded that Plaintiff met the disability insured-statutes requirements of the Act through March 31, 2008, and had "not engaged in substantial gainful activity since January 30, 2006, the alleged onset date." R. 13. Plaintiff was deemed to have two severe impairments: back disorder and stress disorder. *Id.,* at R. 13-14. In step three, the ALJ determined that the combined impairments do not meet or reach the "equivalent in severity to the criteria of any listed impairment, individually or in combination." R. 14. The ALJ concluded that Plaintiff "has the residual functional capacity to perform light work" with these exceptions: "limited to frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; limited to occasional

---

[2] The denial was based on the fact that Plaintiff was not disabled under the Rules, R.46, and the explanation provided stated that the Social Security Administration determined that Plaintiff's "condition is not expected to remain severe enough for 12 months in a row" which would prevent Plaintiff from working. R. 49.

climbing of ladders, ropes, and scaffolds; and limited to the performance of simple, routine tasks."  R. 16.   Plaintiff was found to be not able to perform his past relevant work as an automobile mechanic, which is classified as "medium exertional work at the skilled level."  R. 19.  However, relying upon the "grids,"[3] the ALJ concluded Plaintiff could perform light, unskilled work and was not disabled.  R. 20.

Plaintiff argues that the ALJ erred when he found Plaintiff's allegations of pain were not credible and "violated the 11th Circuit pain standard [which] led him to error by using the Medical-Vocational Guidelines . . . and not calling a Vocational Expert in order to meet the Defendant's burden of proof at Step 5 of the Sequential Evaluation . . . .".  Doc. 12, pp. 7, 11.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

---

[3] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified at the hearing that he completed an associates degree in 1995. R. 26. He said that on January 30, 1996, he was hit by a truck as he was riding a bicycle. *Id*. No bones were broken, but Plaintiff testified that since that time he has "[e]xtreme pain in [his] back constantly." R. 26-27. Plaintiff also complained of depression and said he was "under the care of a psychiatrist for that." R. 27. Plaintiff was honorably discharged from the Marine Corps. R. 30. Plaintiff reported that

because of his depression and pain, three or four days a week he stays in bed until noon. R. 28, 32. He takes a "hot, real hot, real super hot shower until [his] back feels better." R. 32. He said he can only sit up to 45 minutes before his back gets stiff. R. 32. Plaintiff said he can stand only for about 10 to 15 minutes before his back hurts and he must sit down. *Id.*

Plaintiff reported tremors in his hands. R. 33. The ALJ discounted that problem because there was no evidence Plaintiff had ever complained of hand tremors to his physicians, nor sought treatment for such. R. 14.

Plaintiff reported that he went to the emergency room three or four times since the accident with complaints of back pain. R. 34. Plaintiff was prescribed pain medication for three or four days and told to see a chiropractor. *Id.* Plaintiff said he could only lift and carry 5 or 6 pounds and could only walk three or four blocks at any one time. R. 35-36.

Plaintiff reported that he quickly gets angry and explained that it is "hard to keep your cool when you're in pain all the time." R. 36. When his back is hurting, he said he could not "concentrate on anything but [his] back hurting." R. 36. He reported no problems with his memory. *Id.* Plaintiff stated that he has trouble sleeping because of muscle spasms in his back. *Id.* Plaintiff was not then using any pain medications. R. 37.

**Medical evidence**

On January 30, 2006, Plaintiff arrived at the North Florida Regional Medical Center by ambulance following his collision with a truck. R. 117-118. Plaintiff was riding a bicycle. R. 117. The accident report stated that at the end of the accident, one

vehicle rear-ended another vehicle, and the right front tire of the second vehicle came to rest on top of Plaintiff.  R. 107.  Plaintiff was "ambulatory at the scene of the accident, however, he suffered multiple abrasions after falling off the bike."  R. 117.  The emergency report indicates that Plaintiff had a "contusion to the left forehead and also lacerations."  *Id.*  He never lost consciousness, but reported "some headache and some back pain but no radicular pain, no syncopal episodes, no seizures, no vision, hearing or speech problems."  R. 117; *see also* R. 248.[4]  It was determined that the headache was not "significant," and Plaintiff had no "other symptoms or complaints."  *Id.*  Plaintiff's pain was rated at 7 out of 10, and he had multiple abrasions on his hands and legs, but denied "any problems with ambulation."  *Id.*  The report also noted Plaintiff had full function of all digits on both hands with full range or motion.  R. 118.  Plaintiff had palpable tenderness, but had full range of motion in both the upper and lower extremities.  *Id.*  His gait was "without ataxia" and he had "good flexion, extension at the knees with no instability."  *Id.*  Plaintiff's "lumbar region shows some paraspinous tenderness, no midline tenderness or step-off."  *Id.*  The x-rays of the cervical and lumbar spine and pelvis were negative.  R. 118; *see also* R. 254-256.  The head CT scan was also "negative," R. 129, and Plaintiff was released with a prescription of Lortab for pain.  R. 119.  Ibuprofen was also recommended for pain.  *Id.*

Plaintiff was seen by Dr. Adrian Lewis on February 3, 2006, for evaluation of a "possible left orbital fracture" following the bicycle accident.  R. 126; *see also* R. 267.  No fracture or gross deformity of the facial bones was identified.  R. 126.  Dr. Lewis's notes from this encounter reflect that Plaintiff asserted that the right front tire of the truck

---

[4] The record contains duplicative copies of many records.

ran over his lower back.  R. 267.  Dr. Lewis noted "mild bilateral scalene, sternomastoid,

suboccipital, cervical paraspinous and trapezius muscle spasm."  R. 268.  Dr. Lewis's

assessment was cervical facet dysfunction at C3-4 and C4-5 on the left, mild cervical

paraspinous and trapezius muscle spasm, minimal radicular symptoms to the left

trapezius area, with a possible need to rule out cervical disc disease, ligament strain T2

through T10, costovertebral dysfunction T2 to T6 on the right and T2 to T8 on the left,

ligament strain at L1 to the sacrum, lumbar facet dysfunction at L1-2, L2-3, L3-4, L4-5

and L5-S1, mild left SI dysfunction, positive straight leg raising on the left, with a need to

rule out lumbar disc disease, and bruising in the left infraorbital region.  R. 269.  Finally,

Plaintiff had a bilateral rotator cuff strain/tear."  *Id.*  Plaintiff was given prescriptions for

Percocet, Ibuprofen, directed to use ice (not heat), and to begin massage therapy twice

a week and physical therapy once a week.  *Id.*

Dr. Lewis wrote a note to Plaintiff's employer on February 3, 2006, stating that

Plaintiff was under his care and could not return to work at that time, but that Plaintiff

was scheduled for re-evaluation on February 27, 2006, to determine his ability to return

to a normal work schedule.  R. 111; R. 277.  Identical notes were entered extending

Plaintiff's absence from work until March 22, 2006, R. 112; April 12, 2006, R. 113; May

1, 2006, R. 114; May 22, 2006, R. 115; and June 7, 2006, R. 116; *see also* R. 272-276.

There is no evidence of physician ordered "no work status" beyond June 7, 2006.

Dr. Lewis referred Plaintiff to Kristen Jahnke, a physical therapist, for treatment

beginning or February 13, 2006, for his complaints of low back pain.  R. 133-136.

Plaintiff said that he was given medications after being discharged from the ER, but he

said they "haven't helped at all."  R. 133.  Plaintiff said he had pain in his low back which

"shoots up from the tailbone to the cervical spine."  *Id.*  He also complained of stiffness, aching, and having difficulty with bending, moving, walking, and standing.  R. 133-134.

Plaintiff demonstrated "significant antalgic gait, carrying a cane . . . to decrease weight bearing on the left lower extremity to decrease pain in the low back."  R. 134.  After making an assessment, Plaintiff was instructed about his plan of care, given several neuromuscular mobilization techniques to improve mobility and decrease pain, followed by ice and "educated to continue icing at home to decrease inflammation and pain further."  R. 135.  Plaintiff reported "decrease in pain slightly in bilateral shoulders and low back following treatment visit."  *Id.*  The treatment plan was for Plaintiff to "be seen by massage and physical therapy 2-3 times per week . . . ."  R. 136.       Plaintiff returned for treatments by Mr. Jahnke on February 15, 2006, complaining of more pain because of being bitten in the buttocks by a brown recluse spider, R. 138; had a massage on February 20, 2006, R. 140; and returned again for treatment on February 22, 2006.  R. 142.  On the latter date he reported continued stiffness in low back overall. *Id.*  Plaintiff said he had been "working on his motorcycle, sitting on a crate, possibly leaning forward or forward flexing for extended periods of time . . . ."  *Id.*  Plaintiff "demonstrated significant myofascial and muscular restrictions throughout the thoracolumbar spine as well as muscle spasms . . . ."  *Id.*   After treatment, he showed improvement in mobility overall with decreased myofascial and muscular restrictions, and reported "decreased pain and stiffness."  *Id.*  The treatment notes reflect Plaintiff was "progressing gradually with therapy."  *Id.*

Plaintiff had a follow-up visit with Dr. Lewis on February 27, 2006.  R. 265-266.
The notes again reflect that the "left orbital x-rays did not show any evidence of a
fracture."  R. 265.  "Due to a scheduling challenge the patient did not end up having a
lumbar MRI scan performed."  *Id.*  The notes reflect that "all of his wounds are healing
well" and his "other injuries are progressing appropriately with management."  R. 265.
Dr. Lewis found that the "bilateral scalene, sternomastoid, suboccipital, cervical
paraspinous and trapezius muscle spasm have all improved," and the cervical facet
dysfunction at C3-4 and C4-5 on the left was significantly less present.  *Id.*  There was a
definite decrease in tenderness from T2 to T10.  *Id.*  There was no overlying
paraspinous muscle spasm, and Plaintiff was less tender from L1 to his sacrum.  *Id.*
Straight leg raising was still positive on the left but was improved.  *Id.*  Plaintiff was
"averaging two Percocet a day."  *Id.*  A prescription for Flexeril was called in for Plaintiff
on February 15, 2006, but the notes reflect Plaintiff "has not had the financial resources
to fill it."  *Id.*  Plaintiff was to fill the prescription of Flexeril as his finances permitted, and
to continue to take Ibuprofen, use ice as directed, and continue with physical therapy
twice a week and massage therapy once a week.  R. 266.  MRI scans were not ordered,
but the notes indicate they "may need to be ordered in the future if improvement doesn't
continue."  *Id.*

Plaintiff returned for physical therapy on February 27, 2006, complaining of pain
and tightness in the low back.  R. 143.  After treatment, Plaintiff again "demonstrated
improvement in mobility overall and reported decreased pain."  R. 143.  Plaintiff had a
massage on March 3, 2006, R. 145, and another treatment on March 10, 2006.  R. 146.
Plaintiff reported improvement in his neck pain, but more difficulty with neck rotation,

and "less pain in the middle and upper thoracic region, left worse than right." R. 146.

The treatment notes reflect a "spasm in the mid and upper thoracic paraspinal muscles

and intercostals between the 2nd and 9th ribs bilaterally." R. 146. There is also a

"spasm in the suboccipitals" and in the anterolateral cervical musculature." R. 146. The

note concludes that Plaintiff "responded well to treatment today." *Id.*

Plaintiff had a massage on March 13, 2006, R. 148, and treatment on March 15,

2006. R. 149. The notes indicated he demonstrated improvement in mobility overall

after treatment, and was "progressing gradually with therapy." R. 149. After a massage

on March 20, 2006, R. 151, Plaintiff returned for treatment on March 22, 2006, and

reported feeling improvement, but that he continued to have soreness in the low back.

R. 153. After treatment, Plaintiff was educated in several "stretches to be added to his

home exercise program." R. 153. He continued with similar treatments and massages,

with additional physical therapy in a gym, *see* R. 161, 163-64, through June 7, 2006. R.

155-180.

On Plaintiff's follow-up visit to Dr. Lewis on March 22, 2006, the records note that

Plaintiff had been given a pain prescription for Lortab as a substitute for Percocet on

March 20th, which he had not yet filled. R. 263. On examination, Dr. Lewis found that

the "scalene, sternomastoid, suboccipital, cervical paraspinous and trapezius muscle

spasm" had almost resolved, there were hardly any radicular symptoms in the trapezius,

and tenderness was significantly decreased in T2 through T8, L1 to the sacrum, and L1

through S1. *Id.* Straight leg raising on the left had improved to 70 degrees, and most of

the findings made on February 3, 2006, had almost resolved. *Id.* The record also

indicates Plaintiff "never filled the initial prescription of muscle relaxers." *Id.* No

cervical, lumbar or shoulder MRI scans were required, and continued therapy was directed.  R. 264.  Plaintiff was to continue physical therapy, massage therapy, ibuprofen, and ice.  *Id.*  Flexeril was thought to be no longer needed.  *Id.*

A follow-up visit on April 14, 2006, noted that, while standing on a box to change a light bulb, Plaintiff had fallen, landing on his right shoulder.  R.  261.  All of the symptoms identified in the February 3, 2006, visit had essentially resolved.  *Id.*  Plaintiff had some strain or tear of the right rotator cuff due to the fall.  *Id.*  Plaintiff was to continue ice, ibuprofen, and physical therapy.  R. 262.  Plaintiff remained off work, and was to discontinue massage therapy but increase physical therapy.  *Id.*  The notes reflect:  "No MRI scans required at the present time."  *Id.*

Plaintiff returned on May 1, 2006, and the treatment notes he had "continued to progress appropriately with his rehabilitation."  R. 259.  Most of Plaintiff's symptoms had almost resolved, but Dr. Lewis said that he doubted that Plaintiff would have much additional improvement until his strength had increased.  *Id.*  Plaintiff was averaging two Lortab a day.  *Id.*  Plaintiff was to remain off work, continue ice and ibuprofen.  *Id.*  He was also to decrease physical therapy to twice a week, and begin "an extremely cautiously supervised progressive strengthening program normal our rehab gym [sic]."  R. 260.

The treatment notes for May 22, 2006, state that all of Plaintiff's "injuries are progressing appropriately with management except for the lumbar area."  R. 257.  After four gym sessions, Plaintiff's lumbar are had "worsened slightly."  *Id.*  A lumbar MRI had been ordered, but Plaintiff missed the appointment and declined to reschedule it because his lumbar symptoms were gradually improving.  *Id.*  He was to continue

physical therapy, ice, ibuprofen, flexeril, and lortab, and a lumbar MRI scan was ordered.  *Id.*

The results of the lumbar MRI from May 24, 2006, were "unremarkable" at L1-2 and L2-3.  R. 270.  At the L3-4 level, a "dehydrated bulging disc [was] seen" with mild bilateral foraminal narrowing.  *Id.*  At the L4-5 disc level, a minimal disc bulge was seen, and the "central canal and neural foramina appear patent."  *Id.*  It was noted that:  "No disc protrusions or canal stenosis seen in the lumbar spine."  R. 271.

Other medical records reveal that Plaintiff returned to the North Florida Regional Medical Center for emergency treatment several more times.  The reason for treatment, however, was not due to back pain but for a lesion on his forearm (March 3, 2006), R. 240-242; an abscess on his left buttock (February 14, 2006), R. 243-245; for "right ear pain" on July 21, 2008, R. 345-349; and for a dog bite on May 12, 2008, R. 350-354. On December 4, 2007, Plaintiff also went to the Shands AGH Emergency Department for rectal pain and bleeding.  R. 299-305.  Plaintiff also went to Shands Emergency Department for complaints of a "sore throat" and fever.  R. 322.

Plaintiff returned to the emergency room for treatment on May 22, 2007, for complaints of back pain.  R. 355-360.  He had no neck or back tenderness, and range of motion was within normal limits.  R. 355.   Plaintiff was discharged with Lortab and Flexeril for pain and instructed to follow up with his doctor in a week.  R. 358.

Plaintiff was referred to Dr. Phillip L. Parr on July 12, 2007, by Vocational Rehabilitation for his complaints of back pain.  R. 308.  The notes reveal Plaintiff was walking with a cane, but examination of "his back shows he has no deformity."  *Id.* Plaintiff was unable to stand on his toes and heels, could flex forward "only a few

degrees" and "complains of a mildly positive straight leg raising test."  *Id.*  Dr. Parr found

that Plaintiff's "motor function was difficult to assess because he does not try very hard."

*Id.*  Dr. Parr was unable to do a Trendelenburg test,[5] but found that Plaintiff had only

"slight weakness of the left quad compared to the right" and there was "no sensory

deficit."  *Id.*  X-rays of his "lumbar spine including AP and lateral views" taken revealed

no evidence of prior fractures, and the "disk spaces are well maintained."  *Id.*  There

were no arthritic changes and no spondylolisthesis.  *Id.*  Dr. Parr's impression was that

Plaintiff "apparently had significant trauma and he appears to be functionally impaired

but" Dr. Parr was "not sure why."  R. 309.  Dr. Parr ordered an MRI scan to evaluate

Plaintiff's back.  *Id.*

    The MRI was performed on August 1, 2007.  R. 307.  While the notes indicate

Plaintiff could not control his breathing and the images "were motion degraded," they

reveal that the lower spinal cord and conus were "unremarkable."  *Id.*  The T9 disc was

degenerated and decreased in height but with no evidence of cord compression.  *Id.*

the other thoracic disc levels were unremarkable.  There was no abnormality at L1-L3.

*Id.*  At L3-4, there was mild disc bulging with no focal disc protrusion, no foraminal

narrowing, and no focal nerve root compression.  *Id.*  There was no abnormality at L4-5

and L5-S1.  *Id.*  The only impression was mild degenerative spondylosis at L3-4 with no

evidence of focal nerve root compression.  *Id.*

---

    [5] A Trendeleneburg test in this context is a test of the function of the hip joint, and
appears to be a test performed in a standing position.  *See*
http://www.ncbi.nlm.nih.gov/pubmed/4055873 and
web.jbjs.org.uk/cgi/reprint/67-B/5/741.pdf

On November 15, 2007, Dr. Phillip Parr noted from the August MRI that the only abnormalities were the "mild degenerative changes at L3/4." R. 306. Dr. Parr said: "I think he needs nothing but physical therapy for his back." *Id.* Dr. Parr's notes also indicate that Plaintiff complained of "chronic rectal bleeding several times a week" and that is Plaintiff's "most pressing problem." *Id.* Dr. Parr advised Plaintiff that was "not an orthopaedic problem and is not related to his back."

Vocational Rehabilitation referred Plaintiff for a psychological evaluation by Bernie Marrero, Ph.D. R. 310-314. Plaintiff reported that he was rendered unconscious after the January 30, 2006, accident. R. 311. That is contrary to the medical records. R. 248 ("He did not have any loss of consciousness.") Plaintiff said his pain was exacerbated by moving, coughing, and sneezing, and the pain is decreased by "hot water and Ultram." R. 310-311. He reported taking "occasional pain medication" and using marijuana as a "coping" strategy. R. 311. Dr. Marrero thought that Plaintiff "attempted to portray himself in a negative or pathological manner in particular areas. He presents a certain patter of combination of features that are unusual or atypical in clinical populations, but relatively common among individual's [sic] feigning mental disorders." R. 313. Dr. Marrero's assessment was that Plaintiff was "preoccupied with somatization complaints and views himself as physically incapable of returning to work." *Id.* Dr. Marrero thought that Plaintiff's complaints were "related to a dysthymic disorder and pain disorder that are manifested in physical complaints and feelings of worthlessness." *Id.* Dr. Marrero said that Plaintiff demonstrated an "unusual degree of concern about physical functional and health matters and probable impairment arising from somatic symptoms." *Id.* Plaintiff "reports particular problems with the frequent

occurrence of various minor physical symptoms and has vague complaints of health and fatigue." *Id.* Plaintiff reported that his "daily functioning has been compromised by numerous and varied physical problems." *Id.* Dr. Marrero noted the "pattern of symptoms" described by Plaintiff was "consistent with individuals experiencing a somatization disorder." *Id.* Plaintiff was "prone to be distrustful of others, isolating himself with his animals." R. 314. Plaintiff currently had "two squirrels, a fish, baby mice, a cockatiel, two dogs, a turtle, and a Burmese python." *Id.* Because of his emotional and psychological traits, Plaintiff was "prone to experience difficulty working with individuals in a cooperative work setting." *Id.* Dr. Marrero thought Plaintiff would likely "benefit from outdoor types of employment that also involve working with animals." *Id.* It was recommended that Plaintiff be "given Ultram, a nonnarcotic, for pain management" which would likely "result in minimizing the chances for abuse." *Id.* Dr. Marrero's assessment was dysthymic disorder, pain disorder with psychological factors and a general medical condition, and schizoid personality disorder. R. 313.

On May 14, 2008, Plaintiff was referred to Dr. Oscar B. DePaz at Southeastern Rehabilitation for his complaints of localized lower back pain. R. 318-321. Plaintiff said that all other pains following the January, 2006, accident had resolved except for his lower back pain. R. 318. Plaintiff described his pain as "continuous, moderate and severe" as well as "dull, burning, stabbing and 'varies.' " R. 318. He said that the pain does not radiate down his legs. *Id.* He reports that his pain is worse when "standing, walking, lifting, bending, twisting, coughing," and it is better with a "super hot shower." *Id.* Plaintiff also reported some numbness and tingling in his legs "on occasion" but no weakness. R. 319. Plaintiff said his current medications were "Motrin, Ibuprofen,

Lortab, and Amoxicillin." *Id.* There was "tenderness to palpation" and "lumbar neural foraminal compression produces back pain without radiation." R. 320. Dr. DePaz noted that Plaintiff's examination was "compatible with possible facet dysfunction" and he thought "facet injections may be beneficial." R. 320-321. A urine test was positive for marijuana. R. 321. Dr. DePaz thought that Plaintiff's "activity status would be in the range of approximate 25 pound lifting limit avoiding repetitive bending, twisting, stooping or squatting." *Id.*

Plaintiff returned for a follow-up visit with Dr. DePaz at Southeastern Rehabilitation on June 9, 2008. R. 316. Plaintiff reported no changes, and continued to "indicate that his pain is aggravated with activity." *Id.* Plaintiff said his pain was "continuous, moderate and severe" as well as "dull, burning, stabbing." *Id.* Plaintiff also reported having numbness and tingling in his legs on occasion. *Id.* Dr. DePaz noted Plaintiff continued "to move with pain behavior in the form of posturing" and was using a cane. R. 317. He noted Plaintiff's range of motion was "guarded" and he had "tenderness in the lower thoracic spine on left side." *Id.* The notes reflect "some soft tissue dysfunction" in lower thoracic area and he could not "exclude etiology[6] at that level." *Id.* Plaintiff was given a trial of Zanaflex, and an MRI of the thoracic spine was ordered, finding it "would be beneficial to further clear up this patient's complaints and move on in terms of his rehabilitation process." *Id.*

Another MRI of Plaintiff's thoracic spine was taken on August 25, 2008. R. 315. The findings were "normal" with no spinal stenosis, disc bulging, or herniation. *Id.*

---

[6] Etiology refers to the study of causation or origination of diseases or pathologies.

Plaintiff was referred by Vocation Rehabilitation to the University of Florida's Department of Clinical and Health Psychology for psychological evaluation and therapy. R. 339-341.  Plaintiff reported that the past three years had been "particularly challenging due to multiple stressors including his wife leaving him, being run over by a truck, being incarcerated, and being attacked in his apartment and killing the intruder." R. 341.  He showed symptoms of "severe depression, social anxiety, and anger."  *Id.* Plaintiff reported experiencing pain since his bicycle accident, and reported he is in pain all the time.  R. 339.  Plaintiff said that on a 1-10 scale, his pain averages a 4.  *Id.*  At that time, Plaintiff reported avoiding people so as to not talk about killing the intruder, that he "easily 'goes off' on others if they engage in an activity that upsets him" and he expresses his anger by yelling and cursing because his physical limitations prevent him from physically fighting or hurting others as he used to do.  R. 339-340.  Plaintiff had been in therapy in January of 2005 for problems with social anxiety and anger management.  R. 340.  Plaintiff dislikes being around people, but likes taking care of his animals.  *Id.*  At that time, Plaintiff had "a turtle, mice, frogs, two squirrels, two snakes, a dog, cockatoos, a peacock, four fish, and two cats."  *Id.*

It was recommended that Plaintiff begin cognitive therapy to address his depression, treatment for "Acute Stress Disorder (ASD)," anger management therapy, and it was thought he would "also benefit from cognitive-behavior pain-management therapy."  R. 341.  He was encouraged to "manage his pain using" certain techniques "rather than taking non-prescribed medication and/or using illegal drugs."  *Id.*

Plaintiff had ten therapy sessions, the first beginning on May 27, 2008.  R. 338. He continued with these sessions with Mary Brinkmeyer, Ph.D., Lori Wadenberg, Ph.

D., and Melissa Stern, M.S. on May 27, 2008, R. 337, and June 26, 2008, R. 336, dealing primarily with anger and stress over events unrelated to the accident.  In his session on July 3, 2008, Plaintiff mentioned "he was working towards finding a job as an accountant and that vocational rehabilitation is helping him to take [a] course at a community college to prepare him for employment."  R. 335.  At the July 17, 2008, session, Plaintiff said he was "in a great deal of pain because of his back and an abscessed tooth."  R. 334.  He was "slurring his speech and was noticeably slower in gait and gross motor movements."  *Id.*  His facial expressions were consistent with him being in pain.  *Id.*

Plaintiff returned for session 6 on July 24, 2008, and said he "was doing much better."  R. 333.  He reported "his tooth was feeling better though he had not yet sought treatment for it."  *Id.*  Session 7 was held on August 7, 2008, and Plaintiff reported "that he felt he was doing well and hadn't had any further problems with meeting basic needs."  R. 332.  He did "express frustration with rescheduling an MRI for his back so he could begin receiving treatment."  *Id.*

Plaintiff had another psychological evaluation on September 2, 2008, although he was originally scheduled to be seen on August 26, 2008, but that appointment was rescheduled because Plaintiff "was scheduled to work that day at the election polls."  R. 331.  Plaintiff reported "doing well" and said he had been having "disturbing dreams" and "expressed that he is unhappy and something has changed since he killed Mr. Aden."  R. 331.

Plaintiff's psychological evaluation for September 17, 2008, indicates that Plaintiff reported being "in significant pain in his back and is frustrated that the results of his MRI

came back normal."  R. 330.  Plaintiff felt his "doctors do not trust or believe him and do

not move fast enough."  *Id.*  Plaintiff was to work on anger management techniques.  *Id.*


The tenth session and last record of Plaintiff's psychological evaluation was on

September 24, 2008.  R. 329.  Plaintiff reported having a good week, feeling prepared

for an "upcoming Alachua County Housing Authority Inspection."  R. 329.  Plaintiff said

he "was working on redoing his floors."  *Id.*  Plaintiff was "experiencing a significant

amount of stress and [was] having difficulty coping with [the] stress."  R. 329.  The

treatment plan included anger management techniques and to "begin CBT for

depression."  *Id.*

**Legal Analysis**

**Plaintiff's Credibility**

Plaintiff contends the ALJ erred in finding Plaintiff's allegations of pain were not

credible.  Doc. 12, p. 7.  Pain and other symptoms reasonably attributed to a medically

determinable impairment are relevant evidence for determining residual functional

capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect

either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,

that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d
1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated by

the ALJ for disregarding the claimant's subjective testimony must be based upon

substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d

1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this

circuit's standard if his findings "leave no doubt as to the appropriate result" under the

law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ found that Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however," he found Plaintiff's

"statements concerning the intensity, persistence and limiting effects of these

symptoms" to not be "credible to the extent that are inconsistent with the residual

functional capacity assessment." R. 18.

Plaintiff points out the emergency room report from the injury on January 30,

2006, which noted several lacerations on the forehead, multiple abrasions, a head

injury, and musculoskeletal lumbar strain. Doc. 12, pp. 8-9; *citing to* doc. 9, p. 119. The

medical records in the period just after the accident, such as the February 13, 2006,

assessment by Dr. Lewis, reveal that Plaintiff had various problems such as "positive

signs of bilateral shoulder impingement, possible rotator cuff tear, headaches due to

cranial suture dysfunction, myofascial and muscular restrictions with associated joint

dysfunctions in cervical, thoracic, and lumbosacral spine with possible disc involvement

in the cervical spine and lumbar spine, as previously noted." Doc. 12, p. 9. The record

also noted that Plaintiff "has difficulty and pain with ADLs [activities of daily living] with

decreased mobility."  Doc. 9, p. 17, *citing to* doc. 9, p. 135.  However, the records reflect

that within five months of the injury (by May, 2006), Plaintiff's "injuries [were]

progressing appropriately with management except for the lumbar area."  R. 257.

Plaintiff complained of pain, but he was receiving only physical and massage therapy,

ice, and mild pain relievers such as Ibuprofen, Flexeril, and Lortab.  *Id.*  His daily

activities were only mildly limiting and he was not taking medications for pain at the time

of the hearing, stating he relied on hot showers for his back pain.  The MRI results

throughout Plaintiff's case were "unremarkable" and in the few occasions where a

bulging disc was seen, *see* R. 270, R. 307, it was "mild."  By August 25, 2008, the MRI

findings were "normal" with no disc bulging or herniation.  R. 315.  The medical

evidence supports the ALJ's finding Plaintiff was in minimal pain, but not of such

severity that it was disabling.

This conclusion is also bolstered by the medical records which reveal Plaintiff

was "preoccupied with somatization complaints and views himself as physically

incapable of returning to work."  R. 313.  Dr. Marrero's records do not reveal a medical

basis for Plaintiff's inability to work or for the level of pain claimed.  Indeed, Dr. Marrero

thought Plaintiff would likely "benefit from outdoor types of employment that also involve

working with animals."  This supports a finding Plaintiff was physically capable of

employment.  Moreover, as noted by the ALJ, "[t]here is no evidence that any of

[Plaintiff's] treating physicians have indicated that [Plaintiff] was disabled . . . ."  R. 18.

There is no evidence that any physician directed Plaintiff not to work after June 7, 2006,

just five months after the accident.  R. 284.  Dr. DePaz thought that Plaintiff's "activity

status would be in the range of approximate 25 pound lifting limit avoiding repetitive

bending, twisting, stooping or squatting."  R. 321.  *Id.*  Dr. Parr thought that Plaintiff's condition would not improve further unless he became stronger and thought that he needed only physical therapy, and that he did not try very hard.  R. 306, 308.  Dr. Lewis thought that Plaintiff would not further improve until he became stronger.   R. 259.  The absence of long-term work limitations imposed by physicians is evidence suggesting that Plaintiff's assessments of his pain were not credible.

While Plaintiff argues that the ALJ improperly observed that Plaintiff should be able to work because of the number of animals Plaintiff took care of, *see* doc. 9, p. 11, but that is not the only activity of daily living mentioned by the ALJ as a basis to discount Plaintiff's pain testimony.  The ALJ also noted that Plaintiff reported that he had worked on cars for friends, worked at the polls, and worked on redoing his floors.  R. 18.  There is substantial evidence in the record for these factual findings. Plaintiff reported having worked on his friends' cars.  R. 216.  He had to reschedule a therapy session because he was working at the election polls in August, 2008.  R. 331.   In September, 2008, Plaintiff was "working on redoing his floors."  R. 329.  The evidence also revealed that Plaintiff was able to work "on his motorcycle, sitting on a crate, possibly leaning forward or forward flexing for extended periods of time . . ."  R. 142.   Activities of daily living, especially those which put strain on the back such as working on floors and motor vehicles, are appropriate considerations when evaluating subjective complains of disabling pain.

Furthermore, Plaintiff was often taking no pain medication, or simply Ibuprofen. He was prescribed physical therapy and ice.  Such conservative medical treatment does not support a finding of disabling pain.  Consideration all of the activities together in their

totality provides substantial evidence to support the ALJ's decision that Plaintiff was not a credible witness. The ALJ articulated the reasons for discrediting Plaintiff's testimony, and the evidence supports the conclusion reached.

### Reliance on the Grids

Plaintiff argues that the ALJ should not have used the Medical-Vocational Guidelines (Grids), but should have called a vocational expert. Doc. 12, pp. 11-12. Plaintiff contends that the Grids are not applicable when a "claimant cannot perform each and every mental activity within the Grid Matrix." Doc. 12, p. 12, *citing* Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989). Plaintiff asserts that the "substantial evidence shows on the face of this record that Plaintiff . . . has several severe non-exertional impairments" and therefore, the ALJ "was required to take the testimony of a Vocational Expert." Doc. 12, p. 16.

It is the general rule "that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform." Phillips v. Barnhart 357 F.3d 1232, 1241-1242 (11th Cir. 2004). However, "[e]xclusive reliance on the grids is not appropriate either when [the] claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments[7] that significantly limit basic work skills." Francis v. Heckler, 749 F.2d

---

[7] "Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling. Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands." Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004), *citing* Social Security Ruling 96-4, 61 Fed. Reg. 34488 (July 2, 1996).

1562, 1566 (11th Cir. 1985) (emphasis added), *quoted in* <u>Phillips</u> 357 F.3d at 1242. Thus, it is inappropriate to exclusively rely on the grids only if either of the two conditions exist.

Under the first condition, an ALJ must consult a vocational expert "when the claimant's exertional limitations prevent the claimant from performing a full range of employment." <u>Phillips</u> 357 F.3d at 1242. The term "full range of employment" means "being able to do 'unlimited' types of work at the given exertional level." *Id.* (other citations omitted). Here, the ALJ determined that Plaintiff could perform the full range of work at the light work activity level. Doc. 15, pp. 7-8; R. 20. Plaintiff has not pointed to any evidence showing that he cannot do so.

Under the second condition, the non-exertional impairments, the ALJ found Plaintiff could perform simple, routine tasks and, therefore, retained the mental ability to perform unskilled work. Doc. 15, p. 8; R. 16, 20. Unskilled work needs "little or no judgment to do simple duties that can be learned on the job in a short period of time . . . ." R. 20. Plaintiff points to no facts in the record to show that he has non-exertional limitations which "significantly" limits his basic work skills. Thus, Plaintiff's non-exertional limitations were not severe enough to prevent him from performing the full range of employment at the unskilled light work activity level and he has failed to show that the use of the grids was appropriate in this case.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The

decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for disability and supplemental security income benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 1, 2011.


s/     William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**